1

2

3

4

5

6

7

8

9

10

The Honorable Franklin D. Burgess

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| CARL MEALING, | NO. C05-05778-FDB |
| Plaintiff, | |
| | **CITY OF RIDGEFIELD'S MOTION** |
| v. | **FOR SUMMARY JUDGMENT** |
| CITY OF RIDGEFIELD, WASHINGTON, RIDGEFIELD POLICE DEPARTMENT, RIDGEFIELD POLICE CHIEF BRUCE HALL, BRUCE HALL in his individual capacity, RIDGEFIELD CITY MANAGER GEORGE FOX, GEORGE FOX in his individual capacity, | **NOTE ON MOTION CALENDAR: January 19, 2007** |
| Defendants. | |

### I.    INTRODUCTION

In this action, plaintiff Carl Mealing has asserted an Equal Protection claim under the U.S. Constitution, alleging that his termination from his employment at the Ridgefield Police Department was due to his race (African-American/black).  His claim fails as a matter of law because the Plaintiff cannot establish that the City of Ridgefield had a policy or custom of

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 1

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

race discrimination or endorsed any alleged discriminatory action.  On the contrary, as will be shown, the City of Ridgefield has policies *prohibiting* race discrimination, it did not delegate its authority to change these policies to the City Manager or anyone else, and when the City became aware of Officer Mealing's allegations, it took immediate and appropriate steps to disavow, investigate and remedy any possible improper action.  Officer Mealing also makes several state law claims, including race discrimination, intentional infliction of emotional distress (outrage), and recovery of attorney fees under a wage statute.  These too must fail as a matter of law because plaintiff never complied with the notice of claim statute necessary under state law for any claims against a government entity.  Accordingly, Defendant City of Ridgefield (and Ridgefield Police Department) moves for summary judgment dismissal of all claims against it and dismissal of the City (and the Department) as a defendant in this suit.

## II.    FACTS

The City of Ridgefield is a small community of approximately 2,175 residents, located on the Washington-Oregon border, about fifteen miles north of Portland. **Exhibit A (Declaration of Kay Kammer).**  It operates under a City Council-City Manager form of government, organized pursuant to RCW 35A. **Exhibit A.**  In accordance with state and municipal law, its police department is governed by the Ridgefield Civil Service Commission. **Exhibit A-1, p. 3 section F, G, H & I; Exhibit N, RCW 41.12; Exhibit O, Ridgefield Municipal Code (RMC) 2.64.**  All full time police officers, including the Chief of Police, are subject to Civil Service. **RMC 2.64.060. Exhibit B, Deposition of Bruce Hall, p. 149 ll.23-25, p.150 ll.1-12, p. 423 ll.17-21.**  The Commission's powers and duties include investigating and resolving disputes on matters pertaining to the hiring, employment and dismissal of full-time police officers. **Exhibit O, RMC 2.64.050 (C).**  This extends to the authority to

1  investigate allegations of sex-based or race-based terminations of probationary officers.

2  **Exhibit A-1, section 7.4.**

3      In 2000, the City hired Bruce Hall, then chief of police for the City of Forks, to be its

4  new police chief.  **Exhibit C, Testimony of Bruce Hall, p. 7 ll.24-25, p. 8 ll.1-3.**  Plaintiff,

5  Carl Mealing, had previously worked under Chief Hall at the Forks Police Department but

6  had been let go after less than six months employment there. **Exhibit A-2; Exhibit B, p. 215-**

7  **217.** Although the reason for Mealing's release from Forks is contested, it is undisputed that

8  Chief Hall was aware that there had been numerous citizen complaints about Officer Mealing

9  at Forks, particularly regarding his contacts with women and underage girls. **Exhibit B, p. 84-**

10 **87.** Despite this knowledge and his apparent lack of qualifications for the position, Chief Hall

11 offered Carl Mealing a position at the Ridgefield Police Department as a reserve in 2001 and

12 then as a part-time police officer in 2003.  **Exhibit C, p. 53 ll. 6-8; Exhibit B, p. 80 ll.2-22;**

13 **Exhibit D, Deposition of Carl Mealing, p.71 ll.9-11.**  At that time (2003), Chief Hall

14 mentioned to at least one Ridgefield Police Officer the past allegations of Officer Mealing's

15 stalking a female citizen but told her the complaint had been unfounded.  **Exhibit B, p. 82-83.**

16     When a full-time opening in the police department came up in early 2004, Chief Hall

17 recommended appointing Officer Mealing to the position on a temporary basis, while the

18 Civil Service testing and hiring process for a permanent replacement proceeded.  By this time,

19 George Fox had become Interim City Manager (later to become regular City Manager).  Mr.

20 Fox approved the four-month appointment of Officer Mealing. **Exhibit A-3; Exhibit C, p. 54**

21 **ll. 14-15; Exhibit B, p.33 ll.13-23, p.34 ll.8-14.**    Because of the small size of the City and

22 number of city employees, when he approved this change in classification, Mr. Fox had

23 already met and knew who Officer Mealing was and was aware that Officer Mealing was an

24 African-American.  **Exhibit B p. 333 ll. 10-23; Exhibit D p. 174 ll.18-25, p.175 ll. 1,**

25 **Exhibit F, Declaration of George Fox.**  Mealing's appointment was subsequently extended

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 3

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

1  for an additional 60 days to allow time to complete psychological evaluations in the Civil

2  Service selection process. **Exhibit C, p. 58 ll. 14-20; Exhibit A-4.** Officer Mealing had

3  tested for the non-temporary position and been placed on the Civil Service's hiring list. From

4  this list, Chief Hall selected and, again with the approval of George Fox, hired Officer

5  Mealing to the full-time, higher-paying, non-temporary position, effective October 1, 2004.

6  **Exhibit B p. 334 ll.12-25, Exhibit A-5.**

7       Over the next several months, complaints about Officer Mealing began to surface in

8  police departments of surrounding agencies. In particular, police officers in La Center

9  reported complaints to their superior officer, Chief Hopkins, about Officer Mealing's on-duty

10  conduct towards a LaCenter female reserve officer and towards female citizens in the

11  LaCenter area. **Exhibits A-6 and A-7.** They complained of conduct included Mealing's

12  asking personal questions to the women about their marriages, giving out his private phone

13  number, and soliciting dates while on duty and in uniform.[1] Chief Hopkins relayed the

14  information from his officers to Chief Hall and Ridgefield Sergeant, Randy Ostrander.

15  Despite similar concerns about Officer Mealing harassing women raised by Hall's own

16  officers, and by the polygraph examiner in the civil service selection process and the

17  complaints similarity to Mealing's past pattern of conduct, Chief Hall did nothing more than

18  informally remind Mealing to be careful. **Exhibit B, p.94-96; p.309-315.** During the spring

19  of 2005, a detective in Clark County Sheriff's Department began investigating similar

20  complaints. **Exhibit A-8.** In early August, Chief Hopkins forwarded to Chief Hall two more

21  complaints about Officer Mealing from a LaCenter officer. One complaint involved

22  Mealing's delayed response to a 911 call and failure to respond to the correct location, stating

23  it appeared that Officer Mealing had been out of his area while on duty when the call came in.

24  ――――――――――――――――

25  [1] Officer Mealing has since admitted to engaging in this type of behavior, both at Forks and in Ridgefield and LaCenter. **Exhibit D p.60-63, p. 92-94, p. 115-116, p. 133-135, p. 139 ll.24-25-p. 140 ll.1-6, p. 214 ll.5-14, p.241.**

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

1   **Exhibit A-9.** The other Complaint was dated June 2005 and outlined additional complaints by

2   female citizens. The complaining officer questioned whether earlier complaints had been

3   properly addressed by Hall and suggested that an outside agency look into the complaints, as

4   they were impacting LaCenter police. **Exhibit A-10.**

5         Around this same time (early August 2005), City-Manager George Fox for the first time

6   suggested that Carl Mealing should be dismissed. He informed Chief Hall that he had

7   received verbal complaints from three Ridgefield citizens about Mealing following and

8   harassing women. **Exhibit B, p.323 ll.13-21.** Mr. Fox had recently met with members of the

9   Ridgefield Police Association and had learned of some of the other officers' concerns about

10   Mealing and Hall, including information about an apparent pattern of previous complaints

11   from women against Officer Mealing. Mr. Fox asked to review Officer Mealing's personnel

12   file, which Chief Hall then showed him. **Exhibit C, p. 124 ll.24-25, p. 125 ll.1-.6.** The

13   personnel file contained the background check and polygraph test with some information

14   regarding similar incidents and complaints in Officer Mealing's past. **Exhibit A.** Hall also

15   told Mr. Fox about at least one of the harassment incidents at Forks. **Exhibit C, p.127 ll.4-15.**

16   Mr. Fox suggested that Chief Hall terminate Officer Mealing while his probationary period

17   was still in effect.[2] Prior to August 2005, Mr. Fox had never expressed any concern about

18   Officer Mealing. **Exhibit B, p.301 ll.7-15**

19         Chief Hall did not immediately comply with the City Manager's request, although Mr.

20   Fox purportedly told Chief Hall to fire Mealing several times between August and September

21

---

22   [2] The Ridgefield Civil Services allows for a one year probationary period for all new hires, appointments and promotions. Once an officer satisfactorily completes the one year probationary period, he can only be

23   terminated for just cause. RMC 2.64.130; **Exhibit A-1, sections 7.2, 7.4.** By the City's calculations, Officer Mealing was within his one year probationary period until the end of September 2005 and, therefore, could be let

24   go regardless of whether just cause existed. Towards the end of September Hall requested an extension of Mealing's probationary period from the Union of which Officer Mealing was a member, but, in accordance with

25   Mealing's wishes, the Union refused. **Exhibit A-15; Exhibit D p. 236-237.** Hall did not request an extension from the Civil Service Commission. **Exhibit B p.140-141.**

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

2005. **Exhibit B p. 321 ll. 6-9.** Instead, Hall notified Fox of the written complaints from

LaCenter several weeks after he received them, and stated his intent to turn them over to an

outside agency for investigation. **Exhibit A-11.** Chief Hall forwarded the complaints to

Battleground Police Department on September 6, 2005 where Lt. Butler undertook an

investigation into the two complaints. **Exhibit A-12.** Officer Mealing was notified of the

investigation on September 15th and the fact that it included concerns about a "growing

number of other complaints, comments or rumors against [him] in the La Center area."

**Exhibit A-13.** During the course of this investigation, the incomplete Clark County Sheriff's

Office investigation was brought to Lt. Butler's attention. **Exhibit A-8.** Lt. Butler received a

summary of the partial investigation and was also given some of the earlier LaCenter

complaints. On September 26, Lt. Butler advised Chief Hall of the LaCenter and Clark

County complaints and asked if there were any other issues he needed to know about. He also

asked for cell phone records, daily logs, Mealing's background investigation report,

polygraph and psych reports, including those from Forks. **Exhibit A-14; Exhibit B p. 128**

**ll.22-25 p.129 ll.1-10.**

     The next day (September 27) Chief Hall contacted an attorney to assist in drafting a

termination letter to give to Carl Mealing. **Exhibit B p.108; Exhibit A-14.** On September 28,

2005, Hall received the Union's refusal, at Carl Mealing's direction, to extend Officer

Mealing's probationary period to allow time to complete the investigation. **Exhibit A-15;**

**Exhibit D, p. 236 ll. 11-23, p. 237 ll. 2-11.** The Battleground investigation was abruptly

terminated the same day, before it was completed. **Exhibit A-14; Exhibit B p.456, p. 457 ll.**

**1-3.** That day (September 28), Chief Hall also drove to Tumwater to notify Officer Mealing

that his employment at the City was ended. **Exhibit D p. 36 ll.17-25, p. 37-40.** The decision

was formalized in a memo from Chief Hall to Mealing dismissing him from employment with

the City of Ridgefield. **Exhibit G.**

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 6

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

1    In explaining his reasons for terminating Officer Mealing, Chief Hall has identified a

2    variety of factors.  In particular, he was concerned by the information from the Battle Ground

3    investigator that additional problems about Officer Mealing were coming to light, and about

4    liability for negligent retention if the outcome of the investigation confirmed the complaints.[3]

5    Hall also took into consideration the request from the City Manager that he dismiss Mealing

6    and the Union's refusal to agree to extend Mealing's probationary period. **Exhibit B p. 139**

7    **ll.10-25, p. 140 ll. 6-17; Exhibit C p. 40-41, p. 113 ; Exhibit D p. 139 ll.8-15.**

8        On October 7, 2005, Officer Mealing appealed his termination to the Civil Service

9    Commission but did not initially allege race as a basis for his termination. **Exhibit A-16.**  At

10   the Civil Service Commission meeting on October 11, Officer Mealing argued that because he

11   had been employed at the City for more than one year he should not be considered a

12   probationary employee and therefore should only be dismissed for cause.  In alleging that the

13   basis for his termination as insufficient to meet a just cause standard, at some point,[4] Officer

14   Mealing further asserted that his termination stemmed from illegal racial discrimination.

15   **Exhibit A-17.**  This was the first time that Officer Mealing made any allegation of race

16   discrimination to the City or complained of any treatment he had received from the City.[5]

17

18   [3] Although not identified as such by Chief Hall, he must have been concerned that he could face liability for
     negligent hiring based on his knowledge of Mealing's past behavior if the complaints proved to be true.

19
20   [4] It is unclear when exactly Officer Mealing first made this allegation to the City.  Documentation indicates that
     it was sometime after October 11 and before November 8.  neither his letter appealing his termination nor the
     Minutes from the October 11 Civil  Service Commission meeting mention any such allegation.  Exhibits A-16,
21   A-17, A-23.

22   [5] Officer Mealing had complained about the Union's treatment of him but the Union is not an agent of the City.
     This was explained to him at the time. **Exhibit D p. 238, ll.12-18.** The City assisted him as far as it could by
     referring him to an attorney to help him sort out any potential legal problems he might be having with the Union.
23   **Exhibit D p. 77-78, p. 185-188, p. 190-192, p. 231 ll. 5-7.**  Not until after his termination did Officer Mealing
     make any complaint of discrimination concerning the City.  **Exhibit D, p. 220-221, p. 239 ll.13-15.**  Even now
24   his complaint of discrimination is actually directed at the Union, who is not even a party to this lawsuit. **Exhibit
     D p. 52 ll. 12-25, p. 207.**

25

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

1   **Exhibit D, p. 112 ll.2-25, p. 192 ll. 13-25,p. 220 ll.18-25, p. 221 ll.1-25, p. 239 ll.13-15.** The

2   Commission agreed to review any briefing he provided before the next civil service

3   commission meeting on November 8 so it could determine whether it had jurisdiction over the

4   matter. **Exhibit A-17.**

5       To facilitate matters, the Civil Service Commission allowed the depositions of Chief Hall

6   and of Jacklyn Empter, a woman who had dated the City Manager between August and

7   October 2005. According to Ms Empter, shortly after Mealing was fired, when she and Mr.

8   Fox were alone together at Fox's house, George Fox had answered her question of why

9   Mealing had been fired with the comment "he's black," a laugh, and references to the

10  harassment complaints about Mealing from women. **Exhibit E.  Dep of Empter p. 177-184.**

11  Even assuming for purposes of summary judgment that this comment were true, until Ms

12  Empter's testimony, no one at the City was aware of Fox's alleged racial animus and only in

13  retrospect has anyone considered other comments by him to be odd. **Exhibit B, p. 288 ll. 6-**

14  **22, p. 301 ll. 3-15.** Even Carl Mealing has denied having any problems with Mr. Fox prior to

15  learning of Ms Empter's allegations. **Exhibit D, p. 220 ll. 1-7, p. 221, p. 222 ll. 1-13, p. 206 –**

16  **209.** While the Civil Service Commission undertook the investigation into Mr. Mealing's

17  claims, Mr. Fox was placed on Administrative leave. **Exhibit H.** The City also explored an

18  offer of Reinstatement sent to Mr. Mealing's attorney by Mike Wynne, Ridgefield City

19  Attorney, while the Civil Service Proceeding was pending. In Mr. Trumble's responsive

20  letter, he refused the City's offer to restore Mr. Mealing to his prior position. **Exhibits I and**

21  **J.**

22      Importantly, the City has written policies against any discriminatory activity.[6] These

23  anti-discriminatory policies are reiterated in the police department policies,[7] the civil service

24  _____

25      [6] City of Ridgefield personnel policies and procedures, adopted by resolution No. 165 in December 1992
    states that "The City is an equal employment opportunity employer. The City employs, retains, promotes,
    terminates and otherwise treats all employees and job applicants on the basis of merit, qualifications, and

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

rules[8] and the collective bargaining agreement between the City and the police officers'

union.[9] **Exhibits A-18, A-19, A-1 and A-20.** Any action taken contrary to these policies was

outside the scope Mr. Fox's and Chief Hall's authority. The City never authorized Mr. Fox or

Chief Hall to create policies contrary to law or its personnel policies.[10]

---

competence. This policy shall be applied without regard to any individual's sex, race, color, religion, national origin, pregnancy, age, marital status, medical condition, physical handicap or disability, or status as a Vietnam era or special disabled veteran in accordance with applicable federal and state laws." **Exhibit A-18 Section 1.2(a).** Although section 1.3 deals primarily with sexual harassment, it states the City's more general policy against discrimination. "It is the policy of the City to provide a work environment for its employees which is free from discrimination and intimidation." **Exhibit A-18 Section 1.3(a).** Section 8.13 provides a complaint procedure if an employee feels he has been treated unfairly. Section 3.1(a) prohibits discrimination on the basis of race in recruitment and section 9.2 prohibits terminations based on discriminatory reasons. "No employee will be disciplined or terminated for a discriminatory or otherwise illegal reason." **Exhibit A-18 Sections 8.13, 3.1(a) and  9.2(b).**

[7] "The Ridgefield Police Department is an Equal Opportunity Employer. Being such the Ridgefield Police Department will enforce all federal, sate and local laws, ordinances, rules, directives or advisories that pertain to Equal opportunity Employment." **Exhibit A-19 section 17.2.1.** "The Ridgefield Police Department will conform to City Personnel Policy as outlined in Chapter 3 (Recruitment and Hiring) and Rule 3 of the Civil Service Commission Rules, when selecting officer applicants, non uniformed employee applicants, and any other police employees." **Section 17.1.1.**

[8] The Civil service rules provide that  "[a]ll appointments within the services, whether entry-level or promotional, shall be made solely on the basis of merit, efficiency, and fitness, which shall be ascertained by open competitive examination and impartial investigations" and that "the Commission will assure the examinations and advertisements therefore conform to regulations of the Equal Employment Opportunity Commission in that they are job related and that they do not screen out any qualified persons." **Exhibit A-1 6.1, 3.2.** "At any time during the probationary period the appointing authority may terminate that appointment of the person certified to him/her if, during the performance tests thus afforded, upon observation r consideration of the performance of duty, he/she is found unfit or unsatisfactory. ...For entry -level position, such action by the appointing authority is not subject to appeal except upon a claim filed within ten days with the Commission that the action was based on discrimination on account of race or sex. For promotional positions, the appointed employee shall have the right to revert to the position that he last held permanent class. Such action on the part of the appointing authority is not subject to appeal, except upon a claim filed within ten days with the Commission that the action was based on account of race or sex." **Exhibit A-1, section 7.4.**

[9] The Collective Bargaining Agreement between City of Ridgefield and Ridgefield Police Officers Association in effect at the time included "The provisions of this agreement shall be applied equally to all employees in the bargaining unit without discrimination as to age, sex, marital status, race, color, creed, religion, national origin, political affiliation, or the presence of any sensory, mental or physical disability unless there is a bona fide occupational qualification." **Exhibit A-20, section 2.04.**

[10] Even Mr. Fox's contract, which in part has been found to be void under state law, **Exhibit L** never granted Mr. Fox authority change the City's anti-discrimination policies. Although it allowed Mr. Fox the ability to adopt appropriate management policies, all such authority was subject to RCW 35A.13 and to "applicable RCWs and WACs, City ordinances and resolutions," which would include the laws against discrimination, the City's employment policies and Civil Service regulations. **Exhibit A-21, sections 6(a)(i), 6(a)(ii) and 6(a)(ii)(6).** Section H of the Police Department Policies' Introduction allowed the Chief of Police to set departmental policy

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 9

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

1    On the same day as Ms Empter's deposition (October 28, 2005), Officer Mealing's

2    attorney mentioned in a letter to the City attorney that he was preparing a sixty-day notice for

3    unspecified state claims against the City. He also stated Mealing's intent to sue the City in

4    federal court, although the Civil Service Commission had not even had an opportunity to

5    review the allegations. **Exhibit A-22.**   The City never received a notice of claim from Officer

6    Mealing.  **Exhibit A.**

7    A week later, at the scheduled November 8 meeting, the Civil Service Commission set a

8    hearing date to investigate the race discrimination allegation pursuant to CSR 7.4, which gives

9    the Civil Service Commission authority over all potentially race-based terminations even for

10   probationary police officers.  Officer Mealing immediately withdrew his race discrimination

11   complaint from the Civil Service Commission.  By doing so he deliberately limited the issue

12   before the Commission to his status and, if his status were found to be permanent rather than

13   probationary, to whether there was just cause to terminate him.  **Exhibit A-23.**  That same

14   night, the Commission placed Officer Mealing on paid administrative leave with full benefits,

15   retroactive from the date of his termination, pending a determination of his employment

16   status. **Exhibits A-23 and A-24.**

17   Despite Officer Mealing's withdrawal of his race discrimination complaint, the City

18   continued the process of investigating the allegations to ensure that its policies had not been

19   violated.  As stated, the City's elected officials placed George Fox on administrative leave

20   pending an investigation into the question of possible improper or discriminatory motivation

21   in taking the actions he did regarding Mr. Mealing.  **Exhibit H.** That same day (December 1),

22   without having ever provided the City with a notice of claim or allowing it time to investigate

23

24   only within the guidelines set forth by the Mayor and Council (guidelines such as the City's anti-discrimination
     policies). **Exhibit A-19, introduction section A-4.** As explained in detail below, both Chief Hall's and Mr.

25   Fox's authority were also subject to Civil Service review.

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 10

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

1  the discrimination allegations, Officer Mealing filed the current lawsuit in Federal Court,

2  naming the City as a defendant, as well as Bruce Hall and George Fox in their individual

3  capacities. **Exhibit A.**

4      In December, the Civil Service Commission offered to allow Officer Mealing to return

5  to work at the Ridgefield Police Department but Officer Mealing ultimately refused. **Exhibits**

6  **I and J.** He based his refusal upon the fact that another officer, Cathy Doriot, was still

7  working there, although she was not named as a party to his complaint and he had not at that

8  time alleged that she had created any kind of hostile work environment. **Exhibit D p.35 ll.4-**

9  **18.** At the Civil Service hearing in February, Officer Mealing withdrew his appeal entirely

10 rather than have the Civil Service Commission determine whether he was a probationary or a

11 permanent employee.  He thereby accepted the termination from his job, and rejected any

12 opportunity to be reinstated or confirm whether just cause had existed for his termination, just

13 as he had earlier rejected the City's attempt to fully investigate his race claim. **Exhibit A-26,**

14 **p.7 ll.3-8, p.9 ll.1-10, 21-24.** Only after withdrawing his Civil Service appeal did his salary

15 and benefits stop. **Exhibit D, p. 47 ll. 4-9.**

16     Meanwhile, the City through its attorney had hired the Kirkland Police Department to

17 conduct an independent investigation into Officer Mealing's allegations.  In particular the

18 Kirkland investigators were to address whether Officer Mealing had been discriminated

19 against, whether Officer Doriot had created a hostile work environment, whether Officer

20 Mealing had been fired for just cause, whether the police department was being properly

21 managed and whether the investigators had any recommendations. **Exhibit K.**  When the

22 Kirkland investigators concluded their investigation, they found no evidence of the City

23 undermining Mealing's employment due to his race or any evidence of his reporting biased

24 treatment.  They also concluded that there was sufficient evidence of Officer Mealing's

25

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

pattern of harassing women while in uniform to justify terminating him for cause.  They concluded that he should never have been hired in the first place.  **Exhibit K, p. 30-33.**

Shortly after the report came out, Chief Hall resigned.  **Exhibit B, p.37, Exhibit A.** Mr. Fox was also terminated from his position as City Manager and a judge found that his four-year contract with the City contravened state law, and the Council concluded he had been responsible for a variety of misconduct and mismanagement.  **Exhibit M.**

## III.   LEGAL ANALYSIS

### a.  Standard of Review

"One of the primary purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  See Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983). The standard provided by Rule 56 requires not only that there be some alleged factual dispute between the parties, but also that there be genuine issues of material fact.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50(1986). Where the issues are primarily legal rather than factual, summary judgment is particularly appropriate.  Koehn v Indian Hills Community College  371 F3d 394, 396 (8th Cir 2004).  Although a Court must normally draw all inferences from the admissible evidence in the light most favorable to the non-moving party, for purely legal questions, summary judgment is appropriate without deference to the non-moving party.  Here, the City (and the Police Department) moves for dismissal of the claims against it on purely legal grounds.

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

**a. The Equal Protection claim against the City is subject to Dismissal, since there is no proof the City of Ridgefield has a Policy or Custom of Race Discrimination**

To hold a local government liable under §1983, a plaintiff must show that the constitutional deprivation at issue was caused by official policy or longstanding custom.[11] Monell v. Department of Social Services, 436 U.S. 658, 691& 694 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469, 477-78 (1986). Liability will not attach based a respondeat superior or agency theory. Id. Instead, the plaintiff must show that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself constituted an act of official government policy. Pembaur at 480-81.[12]

A "policy" cannot be established merely by identifying a policymaker's conduct and arguing that conduct is attributable to the municipality. The U.S. Supreme Court has emphasized "that not every decision by municipal officers automatically subjects the municipality to §1983 liability. Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official--even a policymaking official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. See, e.g., *Oklahoma City v. Tuttle,* 471 U.S., at 822-824, 105 S.Ct., at 2435-2436. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." Pembaur at 481-

---

[11] Here, Plaintiff does not allege, and there is no evidence to support an allegation, that discrimination was "so permanent and well settled as to constitute a custom or usage with the force of law" necessary to establish liability through custom. City of St. Louis v Praprotnik 485 U.S. 112, 127 (1988). Indeed, the hiring and promotion of Officer Mealing in the years leading up to his dismissal, as well as his own admission that the only difficulties he had prior to his termination were with a separate entity from the City (the Union), would undercut any such allegation, if it were to arise.

[12] Alternately, the plaintiff must prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action *and the basis for it*. Praprotnik, 485 U.S. at 127. This is addressed in part 2 below.

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

82.  Whether an official had final policymaking authority is a question of state law. Praprotnik at 124.  It is not a factual issue for the jury and is, therefore, appropriate for resolution on summary judgment.

Here the City of Ridgefield has long standing written policies and laws clearly prohibiting race discrimination.  To show liability therefore, Officer Mealing must establish that Mr. Fox's alleged discriminatory animus which was in violation of these written policies not only resulted in the termination of Officer Mealing (and despite Chief Hall's legitimate concerns about Mealing's behavior creating potential liability for the City) but that this one action actually changed and created a *new policy* contrary to the City's long standing written policies. "Cases make clear that the unconstitutional discretionary actions of municipal employees generally are not chargeable to the municipality under section 1983.... 'If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.'" Gillette v. Delmore 979 F.2d 1342, 1348 (9th Cir. 1992) (citing Praprotnik at 126).  To establish his theory, therefore, Officer Mealing must show the Mr. Fox (or possibly Chief Hall) was a final policymaker with respect to Officer Mealing's termination.  As a matter of state law, however, neither a City Manager nor a Chief of Police has the authority to set policy over the termination of an employee subject to Civil Service. Accordingly, the equal protection claim against the City should be dismissed.

**1.      The Civil Service Commission, not the City Manager or the Police Chief, is the final policymaker for the City with respect to full-time police officers.**

Courts have often found that the existence of a reviewing body, such as a Civil Service Commission, demonstrates that the individual who did the firing did not have final authority

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

1  such that his or her actions, and therefore their decisions would not create "policy." See, for

2  example, Praprotnik supra. Quinn v Monroe County 330 F.3d 1320, 1328 (11th Cir 2003);

3  Stimpson v City of Tuscaloosa 186 F.3d 1328 (11th Cir 1999).  In Quinn the Court found that

4  the County Administrator was not the final policymaker in the termination of the county

5  library director because the county review board had authority to review the decision and

6  change it if necessary. In affirming summary judgment dismissal of County from suit while

7  reversing dismissal of personal liability of administrator, the Court noted, "Conflation of the

8  'final policymaker' and 'decision maker' inquiries would lead to untenable legal

9  consequences.  Under such a theory, a city manager could intentionally discriminate by

10  terminating an employee without fear of liability so long as, at some point, the decision was

11  reviewed by an unbiased board.  While such a manager should not be able to create *municipal*

12  liability when violating official policy, he should not be able to elude *individual* liability for

13  his own unlawful actions." Id at 1328 (emphasis in original).   Because all termination

14  decisions, including that of Carl Mealing, are reviewable by the Ridgefield Civil Service

15  Commission, the Commission is the final policymaker regarding the hiring and firing of civil

16  service employees, not the appointing authority (i.e. Chief Hall) nor any other City official.

17  Any personal liability by the individuals should not be confused with municipal liability. Any

18  authority the City Manager or the Police Chief may have is purely secondary to authority of

19  the Civil Service Commission to review and where necessary change the decision.   It is not

20  therefore "final" and cannot create final policy.  State law reaffirms this.

21          Under Washington law, the Civil Service System is designed to ensure that all

22  employment practices related to the hiring and firing of fire, police and sheriff are based on

23  merit and not some political or discriminatory reason. RCW 41.08 (fire), RCW 41.12 (police),

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

RCW 41.14 (sheriff).   As the Washington Supreme Court has explained:

> In 1937, the legislature created a civil service system for city police
> departments to achieve the following purposes: (1) provide for promotion on
> the basis of merit, (2) give police officers tenure, and (3) provide for a civil
> service commission to administer the system and to investigate, by public
> hearing, removals, suspensions, demotions, and discharges by the appointing
> power to determine whether such action was or was not made for political or
> religious reasons and whether it was or was not made in good faith for cause.
> Civil service systems were enacted to eliminate the practice of favoritism by
> state and city officials…"[I]n essence, the civil service system was designed to
> replace the spoils system with a merit system".… We have explained that a
> merit system is one that "require[s] public officials to hire, promote and
> discharge employees based on merit rather than political affiliation, religion,
> favoritism or race."

<u>Seattle Police Officer's Guild v City of Seattle</u> 151 Wash.2d 823, 831 (2004)(en banc)

(internal citations omitted).

To comply with civil service laws and ensure that city police are hired, promoted and discharged based solely on merit rather than some political or discriminatory basis, the City established the Ridgefield Civil Service Commission by municipal code in accordance with RCW 41.12.  RMC 2.64.  One of the Ridgefield's Civil Service Commission's powers and duties is to investigate and resolve disputes on matters pertaining to the hiring, employment and dismissal of full-time police officers.  RMC 2.64.050 (C); RMC 2.64.110, RMC 2.64.130.  The City granted the Commission the authority to set the rules for administering this obligation. RMC 2.64.020, 2.64.050 (C)(1).  The Commission's own rules also require it to give full effect to RCW 41.08 and 41.12, to ensure merit-based hirings and firings, and to retain authority to investigate all terminations, including alleged race-based dismissals of probationary police officers. **Exhibit A-1, p. 3 sections F, G, H & I; rule 7.4.**

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

In keeping with Washington's legal requirement of merit-based civil service system, the law clearly subordinates a City Manager's authority to that of Civil Service, and its rules, regulations and oversight.   RCW 35A.13, the code under which the City of Ridgefield operates, lays out the authority of a city manager. The statute states that "[t]he powers and duties of the city manager shall be: (1) To have general supervision over the administrative affairs of the code city; (2) To appoint and remove at any time all department heads, officers, and employees of the code city, except members of the council, and **subject to the provisions of any applicable law, rule, or regulation relating to civil service….**" RCW 35A.13.080 (emphasis added).   It reiterates the limitation that Civil Service laws and rules place on a City Manager's power to remove civil service employees and preserves their right to appeal any such decision under Civil Service provisions.  RCW 35A.13.100 ("The city manager may authorize the head of a department or office responsible to him to appoint and remove subordinates in such department or office. *Any* officer or *employee* who may be appointed by the city manager, or by the head of a department or office, **except one who holds his position subject to civil service,** may be removed by the manager or other such appointing officer at any time **subject to any applicable law, rule, or regulation relating to civil service**. **Subject to the provisions of RCW 35A.13.080 and any applicable civil service provisions,** the decision of the manager or other appointing officer, shall be final and there shall be no appeal therefrom to any other office, body, or court whatsoever."(emphasis added)).

Accordingly, by state law, George Fox as City Manager did not have final policymaking authority in the termination of Carl Mealing and liability cannot attach to the City under §1983 for his actions.

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

Likewise, a Police Chief, although the appointing authority under the Civil Service rules, does not have policymaking authority when it came to firing full-time police officers. That authority rests with the Civil Service Commission. RCW 41.12.050(4); RMC 2.64.060.[13] The Ninth Circuit has already considered the question of whether County Sheriffs in Washington State are official policymakers, and in which areas. Davis v. Mason County, 927 F.2d 1473, 1480-81 (9th Cir.1991), cert. denied 502 U.S. 899 (1991) (overruled on other grounds). In Davis the question was whether a county sheriff could be the official policymaker for training decisions. In concluding a sheriff could be in that capacity, the Ninth Circuit distinguished the function of training from the function of other employment practices such as hiring and firing, which are reserved by law to the Civil Service Commission. Id. at 1480-81. In reaching its conclusion, the Ninth Circuit looked at the purpose of Washington's Sheriff's Office Civil Service statute, which like that of City Police and the rest of Washington's civil service system, is to establish a merit system of employment. Id. at 1480. By extension, a city police chief, like a county sheriff, is not the final policymaker with respect to the function of hiring and firing practices; only the Civil Service Commission has that authority. RCW 41.12.050; RMC 2.64.060, 110 and 130; CS Rule 7.4. Chief Hall's decision that Officer Mealing did not pass his probationary period even if based in part on another's unconstitutional motivation is not chargeable to the municipality

---

[13] "All appointments to and promotions in the department shall be made solely on merit, efficiency, and fitness except as provided in RCW 35.13.360 through 35.13.400, which shall be ascertained by open competitive examination and impartial investigation. No person in the unclassified service shall be reinstated in or transferred, suspended, or discharged from any such place, position, or employment contrary to the provisions of this chapter." RCW 41.12.050(4)

"Classified civil service and provisions of this chapter shall include all full-paid employees of the police department, including the police chief. All appointments to and promotions in the department shall be made solely on merit, efficiency and fitness, which shall be ascertained by open and competitive examination and impartial investigation. No person shall be reinstated in or transferred, suspended or discharged from any place, position or employment contrary to the provisions of this chapter." RMC 2.64.06; Ord. 588 § 5, 1991.

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 18

under § 1983 because the Chief's decision was reviewable by Civil Service where by law employment policy authority lies, and, therefore, as a matter of law, Hall's decision was not "final," was not "policy," and could not create final policy.

Moreover, the City did not authorize any authority to the contrary. Any policymaking authority delegated to the City Manager or the Chief of Police was limited to operating within existing laws and the City's anti-discrimination policies. Mr. Fox's contract unequivocally limited any delegated ability to create policy or to terminate employees to management policies and actions which complied with the "RCW, WAC, City ordinances and resolutions." **Exhibit A-21.** This would include the Washington Laws Against Discrimination as well as the City's employment and civil service policies which were adopted by resolution or ordinance and which included the provisions against discriminatory terminations.  The City clearly never authorized Mr. Fox to violate the laws and never granted him final policy-making authority where it would run counter to existing laws and policies.

Likewise, the policy authority given to the Chief of Police was specifically required to conform to guidelines set by City Council and the Mayor, which by definition would include the prohibition against discrimination in employment practices. **Exhibit A-19, section H.** Therefore, even without the existence of a reviewing board like the Civil Service Commission, the City should not be held liable for actions which it never authorized George Fox or Bruce Hall to make, which are contrary to its promulgated and long standing policies, and which the City sought to remedy as soon as it learned of the alleged violation.

"The authority to make municipal policy is necessarily the authority to make *final* policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 19

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

1  act of the municipality.   Similarly, when a subordinate's decision is subject to review by the

2  municipality's authorized policymakers, they have retained the authority to measure the

3  official's conduct for conformance with *their* policies." Praprotnik at 128.  The City and the

4  Commission's own written policies clearly did not allow the Chief or the City Manager to

5  make race-based decisions. Because neither Chief Hall nor Mr. Fox were the official

6  policymaker for Ridgefield with regard to any termination decision which may have been

7  outside or contrary to City policy, municipal liability cannot be imputed to Ridgefield for their

8  actions.

9
        **2.    The City's Civil Service Commission did not Ratify the actions of George**
10 **Fox or Bruce Hall but took Steps to Investigate and Prevent any Alleged Discriminatory**
   **Actions.**
11

12        Although a municipality may be liable under § 1983 where it ratifies a non-final

13 policymaker's unconstitutional decision and the basis for it, in the present case Plaintiff will

14 be unable to establish any ratification occurred. "Praprotnik requires that a policymaker

15 approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to

16 have ratified the subordinate's discretionary decision." Gilette, supra. at 1348 (emphasis in

17 original).  A plaintiff must demonstrate that, through a municipality's *deliberate* conduct, the

18 municipality was the "moving force" behind the injury alleged.  Board of County

19 Commissioners v Brown 520 U.S. 397, 421-423 (1997).   Where a local government takes

20 steps, such as offering reinstatement, to rectify an unconstitutional act of a non-final

21 policymaker, liability will not attach.  Lankford v. City of Hobart 73 F.3d 283 (10th Cir

22 1996). In Lankford, for example, the Court dismissed a section 1983 claim against a City

23 based on its Police Chief's sexual discrimination of an employee because the City "did not

24 acquiesce to [the Police Chief's] actions but rather took steps that resulted in preventing

25

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 20

further harassment and because [the Chief's] conduct constitutes neither a city policy nor custom the district court properly dismissed plaintiffs § 1983 claims." Id. at 287-88.

Here the City and the Civil Service Commission never "ratified" Chief Hall's decision to let Officer Mealing go.  Instead, it took all the steps it could to avoid acquiescing to the decision pending a full investigation.  It placed Officer Mealing on fully paid administrative leave.  It offered to reinstate him but he refused.   Indeed, Officer Mealing did all in his power to prevent the Civil Service Commission from undoing the actions of the Chief.  He withdrew his race discrimination appeal as soon as the City's Civil Service Commission agreed to investigate it, and on the day of his hearing, withdrew the remainder of his appeal before the Commission could reach the question of just cause, thereby preventing any ratification of termination and any improper basis for it.[14]  Furthermore, an independent outside investigation revealed that the City had legitimate compelling reasons not only to terminate Officer Mealing but also to have refused to hire him as a police officer in the first place.  Not only did the City take steps to prevent further harm, it took steps to completely undo the harm by keeping Mr. Mealing on full pay and benefits while the Civil Service hearing and investigation was under way.  Further, the Commission offered Mr. Mealing his job back, which he also refused.  Any harm caused by Mealing's initial termination was due to Officer Mealing's own volitional actions.   Accordingly, Plaintiffs equal protection claims against the City should be dismissed.

### b.  Plaintiff's state law claims must be dismissed as a matter of law because he has failed to comply with the notice of claim statute

---

[14] At the same time, Mealing may have been trying to prevent further inquiry as to the nature of his misconduct which Chief Hall admits prompted him to finally heed Fox's earlier request.

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

1   Mr. Mealing has failed to properly notify and plead his state law claims.  The statutory

2   notice of claim process, which permits municipalities to be sued, requires that a plaintiff place

3   the municipality on notice of the nature of the plaintiff's claims at least 60 days prior to filing

4   suit. RCW 4.96.010 & 4.96.020 (4).  "The purposes of the 60 day waiting period are to enable

5   the City to investigate claims without incurring litigation expenses and to foster inexpensive

6   settlements." Johnston v City of Seattle, 95 Wash.App. 770, 774 (1999).  Officer Mealing's

7   failure to file a notice of claim prior to filing his complaint defeats the purpose of the statute

8   and is sufficient to preclude all of his state law claims.

9   By filing his complaint without providing the City with any prior notice, Officer

10  Mealing has demonstrated bad faith and necessitated the expenditure of litigation expenses

11  before the City could begin to assess the nature of his claims or attempt to initiate any

12  inexpensive settlement.  Although his attorney was clearly aware of this law, Officer Mealing

13  or his counsel simply never bothered to comply with it.  He filed his lawsuit against the City

14  less than five weeks after his attorney mentioned he was in the process of preparing a notice

15  of claim. **Exhibit A-22.**  Even if his allegations to the Civil Service Commission could be

16  taken as an attempt to comply, they were made at the earliest only fifty-two days before he

17  filed his complaint.  He certainly never informed the City of the nature of his state Court

18  claims and never personally verified them prior to filing suit.

19  Moreover, strict compliance with the notice of claim statute is required. The statute

20  uses mandatory language ""no action *shall* be commenced against any local governmental

21  entity for damages arising out of tortious conduct until *sixty days* have elapsed after the claim

22  has first been presented to and filed with the governing body thereof." RCW 4.96.020(4)

23  (emphasis added).  Courts have also consistently ruled that strict compliance with the

24  procedural aspects of RCW 4.96.020 is required.  Failure to comply mandates dismissal.

25  Medina v Public Utility District No. 1 of Benton County 147 Wn 2d 303, 317_318 (2002);

DAVIS GRIMM PAYNE & MARRA
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
(206) 447-0182

1   <u>Pirtle v Spokane Public School District No. 81,</u> 83 Wash.App. 304, 309 (1996) review denied

2   131 Wash.2d 10 (1997) (failure to wait 60 days for notice period to pass mandates dismissal

3   of plaintiff's claims); <u>Reyes v City of Renton</u> 121 Wash.App. 498, *review denied*, 152

4   Wash.2d 1031 (2004) (failure to personally verify the notice of claim also mandates dismissal

5   of claims). Accordingly, Mr. Mealing's state law race discrimination claim, his intentional

6   infliction of emotional distress (outrage) claim, and his claim for recovery of attorney fees

7   under a state wage statute must be dismissed.

8           **c.   The Ridgefield Police Department is not a legal entity subject to suit and any claims against it should be dismissed**

9

10         The claims against the Ridgefield Police Department should be dismissed because a

11   police department is not a legal entity under Washington law.  Under Rule 17(b) of the

12   Federal Rules of Civil Procedure, a police department's capacity to be sued in federal court

13   must be determined by the law of the state.  Fed. R.Civ. P. 17 (b).  Under Washington law

14   police departments are not separate legal entities. RCW § 4.96.010 which permits tort suits to

15   be brought against local government entities defines "local government entities" as "county,

16   city, town, special district, municipal corporation as defined in RCW § 39.50.010, quasi-

17   municipal corporation or public hospital."  RCW § 4.96.010(2).  The Ridgefield police

18   department does not fit into this definition of a local government entity.  Plaintiff in his

19   complaint acknowledges that the Police Department is only "a department of the City."

20   *Complaint p.3 ll.1.*  Accordingly, the Ridgefield police department is not a separate entity and

21   cannot be held separately liable.  Any claims against it should be dismissed.  See also

22   <u>Haverstick Enterprises, Inc. v Financial Federal Credit, Inc.</u> 803 F.Supp. 1251, 1256 (E.D.

23   Mich. 1992) (dismissing claims against police department on 12(b)(6) motion because police

24   department was not a separate legal entity from City); <u>Paredes v City of Odessa</u> 128

25

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 23

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
(206) 447-0182

F.Supp.2d 1009, 1013 (W.D. Texas 2000) (dismissing police department from suit after finding that it is not a legal entity).

## IV.    CONCLUSION

For the grounds stated herein, Defendant City of Ridgefield (and Ridgefield Police Department), respectfully request that this Court grant its motion for summary judgment and dismiss the City from the case for lack of legal or factual support for any claims against the City.  In the alternative, if complete summary judgment is not granted, it requests all unsupported claims be dismissed, effectively simplifying this matter for trial.


DATED at Seattle, Washington, this _15th_ day of _December_, 2006.

DAVIS GRIMM PAYNE & MARRA


By:_____

Eileen M. Lawrence WSBA #11885
Attorney For Defendant City of Ridgefield

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 24

1    CERTIFICATE OF SERVICE

2    The undersigned certifies under penalty of perjury
     of the laws of the State of Washington that, on the
3    __18th__ day of __December__, 2006,
     the foregoing was electronically filed with the Clerk
4    of Court using the CM/ECF system, which will send
     notification of such filing to the following:

5    Jay Trumble
     jt@trumblelaw.net
6
     Susan R. Sampson
7    ssampson@suesampson.net

8    Donald A. Greig
     Donald.greig@landerhold.com
9
     Daniel G. Lloyd
     dgl@leesmart.com
10
     Patricia K. Buchanan
11   pkb@leesmart.com

12

13   _____
     Marcia F. Gay
14

15

16

17

18

19

20

21

22

23

24

25

CITY OF RIDGEFIELD'S MOTION FOR SUMMARY
JUDGMENT - 25

## Index to Exhibits for Ridgefield Summary Judgment Motion

| Exhibit No. | Description |
|---|---|
| A | Declaration Kay Kammer |
| B | Deposition of Bruce Hall |
| C | Civil service deposition of Bruce Hall |
| D | Deposition of Mealing |
| E | Deposition of J. Empter |
| F | Declaration of George Fox |
| G | 9/28/05 Termination L to Mealing |
| H | 12/1/05 Notice of Admin Leave to Fox |
| I | Offer of Reinstatement |
| J | Reply to Offer of Reinstatement |
| K | Kirkland Investigation Report |
| L | Judge Bennett's ruling on validity of K |
| M | Resolution 320 terminating Fox |
| N | RCW 41.12 |
| O | Ridgefield Municipal Code 2.64 |
| A-1 | Civil Service Rules |
| A-2 | Termination letter from Forks |
| A-3 | 3/22/04 notice of temp appointment signed by Fox |
| A-4 | Civil Service commission minutes 7/28/05 |
| A-5 | 10/5/04 notice of appointment |
| A-6 | 1/2/05 statement by Lester |
| A-7 | 3/14/05 statement by Wolfram |
| A-8 | 9/22/05 Det. Bull's report on CCSO investigation |
| A-9 | 8/6/05 complaint from Berry re 911 call |
| A-10 | 6/25/05 complaint from Berry |
| A-11 | 8/28/05 email from Hall to Fox re outside investigation |
| A-12 | 9/6/05 letter requesting investigation |
| A-13 | 9/15/05 notice of administrative investigation |
| A-14 | Battle Ground investigation |
| A-15 | 9/28/05 letter from union denying extension of probationary period |
| A-16 | 10/7/05 letter appealing termination to Civil Service |
| A-17 | Civil Service commission minutes from 10/11/05 |
| A-18 | City employment policy and procedure manual [excerpts—including 12/92 resolution adopting them] |
| A-19 | Police dept policy and procedure manual [excerpts] |
| A-20 | Collective Bargaining Agreement, section 2.04 |
| A-21 | Fox's contract, section 6 |
| A-22 | 10/28/05 letter from Trumble re preparing 60 day notice of claim. |
| A-23 | Civil Service commission minutes 11/8/05 |
| A-24 | 11/10/05 letter from Hall to Fox re Civil Service placing Mealing on paid admin leave |
| A-25 | Civil Service commission minutes 12/13/05 |
| A-26 | Civil Service hearing, p.7 and 9. |

25A